IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

**ESSEX INSURANCE COMPANY,**

**Plaintiff,**

**v.**

**DENNIS LUTZ, Individually and as Liquidation Agent, SAINT ELIZABETH MEDICAL CENTER, and SISTERS OF DIVINE PROVIDENCE, d/b/a SAINT ELIZABETH HEALTH SERVICES,**

**Defendants/Third Party Plaintiffs,**

**v.**

**JOHN RIFFLE, LAWRENCE PARRES and LEWIS, RICE & FINGERISH, L.C.,**

No. 06-CV-0114-DRH

**Third-Party Defendants.**

## MEMORANDUM and ORDER

**HERNDON, Chief Judge:**

### I. Introduction and Background[1]

Now before the Court is Plaintiff's motion for summary judgment (Doc. 105). Plaintiff maintains that summary judgment is proper as the undisputed facts show that Saint Elizabeth Medical Center ("SEMC") and the Sisters of Divine

---

[1] Previously, the Court set forth in detail the procedural history and the allegations contained in Plaintiff's complaint in its Order denying Defendants' motion for summary judgment (Doc. 104). Thus, the Court need not restate them here.

Providence ("SDP") were contractually obligated to purchase the $1 million in insurance coverage for their emergency room physicians and that they must pay the deductible under the Policy. Defendants and Third Party Defendants oppose the motion (Docs. 113 & 117). Based on the record, the applicable case law and the following, the Court grants the motion.

On February 7, 2006, Essex Insurance Company ("Essex") filed a four count complaint against Dennis Lutz, SEMC and SDP based on diversity jurisdiction, **28 U.S.C. § 1332** (Doc. 1). Count I is a claim for breach of contract; Count II is a claim for breach of fiduciary duty; Count III was a claim for conversion and Count IV is a claim for declaratory relief. This case arises out of Defendants' alleged failure to pay a deductible under a liability insurance policy. Count I seeks money damages for deductible amounts already expended and Count IV seeks a declaratory judgment for future amounts paid.

On March 20, 2007, the Court granted in part and denied Defendants' motion to dismiss (Doc. 35). In that Order, the Court dismissed with prejudice Count III of Plaintiff's complaint. Thereafter on November 1, 2007, SEMC, SDP and Lutz filed a third party complaint against John J. Riffle, Lawrence Parres and Lewis, Rice & Fingersh, L.C. for contribution and indemnity alleging that their malpractice is the proximate cause of any liability Defendants may have to Essex (Doc. 57). On June 24, 2008, the Court denied Defendants' motions for summary judgment (Doc. 104). The Court found that the Policy is clear and unambiguous that SEMC and SDP must pay the deductible. Specifically, the Court found:

> After reviewing the Policy as a whole and the case law, the Court finds that the plain language of the Policy is unambiguous. On page 1 of the Declarations, item 7. Deductible states: "As per Endorsement No. 1." and Endorsement No. 1 states the Names Insured as: "SISTERS OF DIVINE PROVIDENCE DBA ST. ELIZABETH HEALTH SERVICES AND ST. ELIZABETH MEDICAL CENTER." Considering the Policy, the Declarations and the Endorsements, the Court finds on its face that the Policy provides that SEMC and SDP are responsible for the deductible.

(Doc. ps. 11-12).

Thereafter, Plaintiff filed its motion for summary judgment. Defendants and Third Party Defendants have responded and Plaintiff replied. As the motion is ripe, the Court turns to address the merits of the motion.

## II. Facts

On March 1, 2001, Dennis Lutz ("Lutz"), Vice President of Finance/CFO of SEMC, executed an application for a Locum Tenens and Contract Staffing Organization Professional Liability Policy. The application that Lutz signed identifies the "applicant organization" as "St. Elizabeth Medical Center." SEMC purchased the Essex Policy to fulfill its contractual obligation with each emergency room physician, pursuant to which SEMC was to supply the physicians with $1 million in insurance coverage.

One of the contracts with the emergency room physician provides in part:

> 9.0 Insurance. SEMC shall produce, procure and maintain, during the term of this agreement, malpractice insurance policy with an insurance company licensed to do business in the State of Illinois, with coverage to both in minimum amounts of $1 million per occurrence in the aggregate. Such policy shall provide coverage to both SEMC and

> physician for activities of physician performed in or for the benefit of SEMC pursuant to this agreement. Such policy shall not provide any coverage for the actions of physician taken outside of SEMC and not pursuant to this agreement.

In addition, the contracts with the emergency room physicians state that "upon termination of this contract, the medical center will continue to provide the physician with insurance coverage for professional services the physician rendered in the SEMC Emergency Room during the terms of this contract." Lutz testified that SEMC purchased the Essex Policy to provide coverage for the independent emergency room physicians because that was a component of the independent contractor's agreement with the physicians.

Essex issued a Locum Tenens/Physician Staffing Services Proffessional Liability Insurance Policy, Policy No. MM-802793 ("the Policy") to named insureds, Sisters of Divine Providence d/b/a St. Elizabeth Health Services and St. Elizabeth Medical Center. The Policy was issued "in consideration of the payment of the premium, [and] the undertaking of the Named Insured to pay the deductible as described herein." The Policy provided that Essex would provide coverage to certain specified "employed and/or contracted emergency room physicians" of St. Elizabeth Health Services and SEMC. SEMC paid the premium for the Essex Policy.

During the Policy period, March 1, 2001 to March 2, 2002, SEMC began to investigate selling its assets. Lutz was involved in the sale of assets and was also involved in negotiating and purchasing the Policy and was the Chief Financial Officer ("CFO") of SEMC at the relevant times. In connection with this sale, Lutz and

SEMC's broker began investigating the cancellation of the Essex policy, and the purchase of an optional extension period. After consultation with the brokers and the law firm Lewis Rice, Lutz and the Board of SEMC decided that they were obligated to purchase the tail coverage. On January 14, 2002, Lutz, now President of SEMC, wrote to Essex Insurance Company in care of Marsh USA stating "SEMC is requesting cancellation of Locum Tenens/Physician Staffing Services Professional Liability Insurance Policy … effective midnight on January 3, 2002." Lutz further stated "I am also requesting that a three year extended reporting endorsement be issued per your quotation at a premium of $610,524.00." Pursuant to Lutz's request, Essex cancelled the Policy effective January 4, 2002, and on the same date, Essex issued a Purchased Optional Extension Period ("OEP") pursuant to the contractual terms of the original policy. The OEP is subject to the same $500,000.00 cost and expense deductible per claim, with an aggregate deductible of $2,500,000.00.

On August 1, 2003 and September 25, 2003, two lawsuits were filed against certain emergency room doctors covered under the Policy: *Robert Przygoda on behalf of Michael J. Pryzgoda v. Raque Ramos, MD, et al.* (03L1069), (the "*Przygoda* matter") filed on August 1, 2003 in Madison County, Illinois Circuit Court, alleging malpractice against nurses, physicians, and SEMC as a result of Michael Pryzgoda's death; and *Estate of Carla Pfeffer, deceased v. St. Elizabeth Medical Center, et al.*, (the "*Pfeffer* matter") filed on September 25, 2003 in the Madison County, Illinois Circuit Court alleging medical malpractice against many

defendants, including three SEMC emergency room physicians. On August 15, 2003, Paul J. Schulte, an attorney with the Lewis Rice law firm, wrote to Crump New York tendering the defense of the *Przgoda* matter, stating "Our law firm has represented SEMC in various legal matters during its operation of various medical facilities, and we continue to be responsible for reporting professional liability claims to certain insurers and other claim professionals." Attached to that letter was a copy of a complaint filed against SEMC and at least one of its former employee-physicians. Schulte forwarded that letter to Crump and requested that the carrier, Essex, retain counsel and defend Dr. Ramos in the *Przygoda* lawsuit. Lutz was listed as receiving a copy of this letter. The letter did not mention that SEMC filed bankruptcy, that SEMC recently obtained the confirmation order, nor that distribution of all assets was commencing.

Essex assumed the defense of the emergency room physicians in the lawsuits. Thomas Rae, claims specialist for Essex's claim administrator, contacted Lutz in June 2004 seeking payment of the first $500,000.00 expended under the coverage. On or about June 29, 2004, Lutz left Rae a voicemail stating that he would contact the appropriate counsel to provide Essex with contact information for payments under the Policy and OEP. On June 29, 2004, Rae wrote Lutz a letter stating: "I enclose the policy, declarations and endorsements applicable to the above-captioned claims. St. Elizabeth was contracted to pay a $500,000.00 deductible, including both liability and expenses, as per endorsement 1, per claim."

On July 13, 2004, Rae wrote Lutz in connection with the *Przygoda*

lawsuit. The letter stated: "As you know, St. Elizabeth's purchased a policy of insurance with Essex and contracted to pay a $500,000 per claim deductible. Costs are being incurred in the defense of our insureds which need to be satisfied. I have previously forwarded a copy of the policy for your review. Please contact me as soon as is possible as to who will satisfy the deductible under the policy as this issue needs to be resolved immediately." Thereafter, Rae wrote to SEMC's counsel, John Riffle, requesting payment of sums due under the deductible. Attached to the demand were copies of the attorney fee bills that Essex received and paid. On November 16, 2004, Essex wrote a Deductible Delinquency payment letter to SEMC's counsel, Riffle, demanding payment of the sums due under the deductible. No payments were ever made.

On January 30, 2006, Essex settled the *Przygoda* matter. Essex paid $500,000.00 in settlement and obtained a release of SEMC. The Release of Claim and Indemnity Agreement signed by Mr. Przygoda states

> Plaintiff specifically waives, releases and agrees to dismiss any claim asserted against [SEMC] relating in any manner to the alleged conduct of Roque Ramos, M.D. and the alleged damages caused by Roque Ramos, M.D.

That Release also reserved Essex's right to bring this action against SMEC to recover the deductibles due and owing. The *Pfeffer* lawsuit remains pending and Essex continues to defend that lawsuit. Currently, Essex has paid in excess of $85,000.00 in defense costs and will likely incur and pay additional defense costs in the future in connection with that lawsuit. To date, Defendants have not paid the deductible.

Thus, this lawsuit ensued.

### III. Summary Judgment

Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." **Fed. R. Civ. Proc. 56(c)**. A genuine issue of material fact exists when the evidence is such that a reasonable jury could find for the nonmovant. ***Buscaglia v. United States,* 25 F.3d 530, 534 (7th Cir. 1994)**. The movant in a motion for summary judgment bears the burden of demonstrating the absence of a genuine issue of material fact by specific citation to the record; if the party succeeds in doing so, the burden shifts to the nonmovant to set forth specific facts showing that there is a genuine issue of fact for trial. **Fed. R. Civ. Proc. 56(e); *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986)**. In considering motions for summary judgment, a court construes all facts and draws all inferences from the record in favor of the nonmoving party. ***Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986)**.

### IV. Analysis

Under Illinois law, "[t]he construction of an insurance policy and a determination of the rights and obligations thereunder are questions of law for the court which are appropriate subjects for disposition by way of summary judgment." ***Crum and Forster Managers Corp. v. Resolution Trust Corp.,* 620 N.E.2d**

1073, 1077 (Ill.1993); *BASF AG v. Great American Assurance Co.*, 522 F.3d 813 (7th Cir. 2008); see also *Roman Catholic Diocese of Springfield in Ill. v. Maryland Cas. Co.,* 139 F.3d 561, 565 (7th Cir. 1998)(stating that "Illinois law … treats the interpretation of an insurance policy and the respective rights and obligations of the insurer and the insured as questions of law that the court may resolve summarily" ). When analyzing an insurance policy, a court must look to the intentions of the parties and consider the policy as a whole, "taking into account the type of insurance for which the parties have contracted, the risks undertaken and purchased, the subject matter that is insured and the purposes of the entire contract." *Id.* **at 1077-78**. Illinois courts have held that clear provisions of insurance policies are to be applied as written. *Illinois Farmers Ins. Co. v. Marchwiany*, 838 N.E.2d 172, 176 (Ill. App. 2005). A policy and its endorsements are to be construed together to determine the meaning and effect of the insurance contract. *Rockford Mutual Ins. Co. v. Economy Fire & Casualty Co.*, 576 N.E.2d 1141, 1144 (Ill. App. 1991). Furthermore, courts generally hold that effect should be given to all parts of the policy, including endorsements. *Central Illinois Public Service Co. v. Allianz Underwriters Insurance Co.*, 608 N.E.2d 155, 158 (Ill. App. 1992). Also, Illinois courts avoid construing contract provisions in such a manner as to render them void. *Dowd & Dowd, Ltd. v. Gleason*, 693 N.E.2d 358, 368 (Ill. 1998). Any ambiguities in the policy must be construed against the drafter, and in favor of the insured party. *Continental Cas.*

***Co. v. McDowell and Colantoni, Ltd.*, 668 N.E.2d 59, 62 (Ill. App. 1996);** *see also* **Outboard Marine Corp. v Liberty Mutual Ins. Co., 607 N.E.2d 1204, 1219 (Ill. 1992)("any insured, whether large and sophisticated or not, must enter into a contract with the insurer that is written according to the insurer's pleasure by the insurer. Generally, since little or no negotiation occurs in this process, the insurer has total control of the terms and the drafting of the contract.").** However, the court should "not search for ambiguity where there is none." ***Crum, 620 N.E.2d at 1077***.

As the Court previously found, SEMC and SDP are obligated under the terms of the Policy to pay the deductible. They were specifically named in the Policy. The Policy identifies Named Insured under the Policy as: "SISTERS OF DIVINE PROVIDENCE DBA ST. ELIZABETH HEALTH SERVICES AND ST. ELIZABETH MEDICAL CENTER." The Named Insureds identified in the "Deductible Endorsement" responsible to pay the deductible are SDP and SMEC. Reading the Policy as a whole, it is clear that Defendants are obligated to pay the deductible, because to interpret the policy otherwise would render the Policy terms mere surplusage and would ignore the endorsements to the Policy. Further, the course of dealings by the parties shows that SMEC and SDP are also responsible to pay the deductible. The evidence shows that SMEC exercised its rights under the Policy by submitting the application for the Policy, paying the premiums of Policy, cancelling

the Policy and purchasing the OEP.[2] Moreover, the evidence reveals that SEMC was contractually obligated to purchase $1 million of insurance coverage for the physicians it hired to staff its emergency room, which SEMC did by purchasing the Policy.

Defendants' arguments that SDP was not a party to the contract are contrary to the evidence and to the Court's previous ruling.[3] Further, the Court rejects SEMC's bankruptcy arguments. Defendants admit that SEMC did not give Essex notice. Instead, they argue that the bankruptcy publication notice was sufficient; that had Essex been identified as a creditor, its claim would have been disallowed; that SEMC learned of Essex's claim after the bankruptcy concluded and the court approved plan was not subject to modification and that almost all of monies Essex's damages were incurred with full knowledge of the SEMC bankruptcy. These arguments are irrelevant.

"An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." ***Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)**. Under Chapter 11, a bankruptcy court's order confirming a reorganization plan "discharges the debtor from any debt

---

[2]The right to purchase the OEP is afforded only to the "Named Insured Under Coverage B."

[3]Further, the cases cited by Defendants and Third Party Defendants are inapposite.

that arose before the date of such confirmation." **11 U.S.C. § 1141(d)(1)(A)**. A confirmation order, "cannot act to discharge and enjoin a claim unless the claimant has received adequate notice of the bankruptcy proceeding and of any claims bare dates fixed therein." ***In re Big O Movers and Storage, Inc.*, 326 B.R. 434, 435 (N.D. Ill. 2005)(citing *In re Longarder and Associates, Inc.*, 855 F.2d 455, 465 (7th Cir. 1998))**. As the Seventh Circuit noted:

> "[i]f his name and address are reasonably ascertainable, he is entitled to have that information sent directly to him, but, if not, then publication if the information in the newspaper or other periodical that he's most likely to see is permitted."

***Fogel v. Zell*, 221 F.3d 995, 963 (7th Cir. 2000)**.

Here, SEMC admits that it did not give Essex notice. SEMC's counsel tendered the defense of one of the lawsuits before the bankruptcy became final. The tender letter did not mention the fact that SEMC was in bankruptcy. Clearly, SMEC and its lawyers knew Essex's address, knew of the Policy, and knew of the deductible. Under the circumstances, Essex should have been afforded notice of the bankruptcy.

Lastly, the Court finds that Essex is entitled to recover prejudgment interest under the Illinois Interest Act, 815 ILCS 205/2.[4] Illinois law provides for five percent annual simple interest on an insurance policy. ***See New Hampshire v.***

---

[4] 815 ILCS 205/2 provides: "Creditors shall be allowed to receive at the rate of five (5) per centum per annum for all moneys after they become due on any bond, promissory note, or other instrument of writing; on money lent or advanced for the use of another; on money due on the settlement of account from the day of liquidating accounts between the parties and ascertaining the balance on money received to the use of another and retained without the owner's knowledge; and on money withheld by an unreasonable and vexatious delay of payment."

*Hanover Ins. Co.*, 296 Ill. App. 3d 701, 706 (1st. Dist. 1998); *Plantinum Tech., Inc. v. Fed'l Ins. Co.*, 282 F.3d 927-931-33 (7th Cir. 2000).

## V. Conclusion

Accordingly, the Court **GRANTS** Plaintiffs' motion for summary judgment (Doc. 105). At the close of the case, the Court **ORDERS** the Clerk of the Court to enter judgment in favor of Essex Insurance Company and against Defendants SMEC and SDP on Counts I and IV. Judgment is entered in the amount of $585,000.00, plus prejudgment interest at the rate of five (5%). Further, the Court **DECLARES** that Defendants SMEC and SDP must pay all future defense fees and costs any sums paid in settlement or judgment in the *Pfeffer* case until the time the $500,000.00 deductible for that claim is fully satisfied.

**IT IS SO ORDERED.**

Signed this 20th day of March, 2009.

/s/    *David R Herndon*

**Chief Judge**
**United States District Court**